## STATE OF VERMONT

| SUPERIOR COURT<br>Environmental Division Unit | ENVIRONMENTAL DIVISION<br>Docket No. 60-6-16 Vtec |
| --- | --- |
| Agency of Natural Resources,<br>    Petitioner<br><br>v.<br><br>Wesco, Inc.,<br>    Respondent | DECISION ON THE MERITS |

This matter arises out of Respondent Wesco, Inc.'s (Respondent) alleged release in 2011 of gasoline (a hazardous material) into surface water, groundwater and land of the state; Respondent's alleged failure to install appropriate overfill protection, failure to install cathodic protection, failure to make documents, records and report available, and failure to report a suspected release all at or relating to property at 56 Pearl Street, Essex Junction, Vermont. In a May 3, 2016 Administrative Order (AO),[1] the Vermont Agency of Natural Resources (ANR) alleges violations of the Vermont Waste Management law, 10 V.S.A. § 6616, and Vermont's Underground Storage Tank Rules (VUST Rules). The AO sets out factual allegations describing Respondent's prohibited release and associated failures. The AO does not seek further remediation; however, ANR seeks administrative penalties of $106,466.35 for the violations.[2] On July 1, 2016, Respondent requested a hearing on the AO with this Court.

The Court conducted a merits hearing at the Vermont Superior Court, Costello Courthouse in Burlington, Vermont on June 15 and 16, 2017. Appearing at the trial were Randy J. Miller, II, Esq. and John Zaikowski, Esq. representing the Agency of Natural Resources and Tristram J. Coffin, Esq. representing Respondent.

---

[1] The AO was filed with the Court on June 24, 2016.

[2] This includes $97,000 in penalties set out in the AO, in addition to $9,466.35 to cover the cost of enforcement.

## Findings of Fact

Based upon the evidence presented at trial, the Court renders the following Findings of Fact and Conclusions of Law.

1. Respondent owns the Champlain Farms fuel station and convenience store at 56 Pearl Street, Essex Junction, Vermont.

2. On May 24, 2011, the ANR Department of Public Safety's Vermont Hazardous Materials Response Team was notified by the Essex Junction Fire Department that there was a concern of elevated gasoline vapors in the area of the Post Office Square Shopping Plaza off of Pearl Street in Essex Junction, Vermont.

3. Respondent's technician had been dispatched to the site to investigate possible sources of inventory discrepancy.

4. Upon inspection, ANR discovered explosive levels of petroleum vapors within catch basins of a storm drain system on the Shopping Plaza property.

5. The Shopping Plaza occupants include retail and commercial businesses open to the public. There is also a post office at the Shopping Plaza.

6. The Fire Department evacuated the Shopping Plaza and closed the businesses due to the threat of explosion.

7. Agency personnel inspected the spill buckets for Respondent's underground gasoline storage tanks.

8. By the end of the inspection, the owners of the Shopping Plaza had brought in a consultant and installed a ventilation system on the storm drain where the gasoline vapors had been detected.

9. On the morning of May 25, 2011, Thomas Unkles, an Agency representative, performed an inspection. Mr. Unkles was accompanied on the inspection by David McQuade, Wesco's Director of Environmental Compliance.

10. In the afternoon, Respondent has its tanks and underground piping system inspected by a private contractor, Tanknology, Inc.

11. On May 26, 2011, Jerry Tanner, Wesco's technician, performed a leak inspection.

12. Agency personnel returned to the site and alleged that a faulty O-ring was the likely source of the release. Mr. Tanner, however, testified that based on his inspection the O-ring could not have been the cause of the release. Ultimately, no conclusive or compelling evidence was presented to indicate the cause or duration of the release.

13. On May 27, 2011, Respondent's representatives reported to the Agency the inventory records.

14. On June 1, 2011, Agency personnel returned to the facility and observed the installation of additional monitoring wells by Respondent's consultant.

15. On June 3, 2011, Agency personnel requested copies of inventory reconciliation records for the facility's gasoline tanks for the period of January 2011 until June 3, 2011 be brought to a meeting scheduled for June 6, 2011.

16. On June 6, 2011, Agency personnel met with Respondent's representative and consultant to discuss remedial steps at the facility.

17. On June 8, 2011, the Agency issued Respondent a Notice of Alleged Violation (NOAV) with compliance directives to immediately pump, empty and cease operation of the gasoline tanks at the facility, and to remove the underground storage tanks from the ground and allow contractors access to remove free product and petroleum contaminated soils from beneath and around the tanks.

18. On June 9, 2011, Agency personnel reviewed the boring log and monitoring well construction diagrams prepared and submitted by Respondent's consultant. The Agency also applied for an Emergency Order (EO) ordering Respondent to immediately empty underground storage tanks and cease operation of dispensing activities, and within five days to remove underground storage tanks, contaminated soils, and free product, and to properly dispose of these materials.

19. On June 16, 2011, the Environmental Division issued the EO requested by the Agency.

20. In cooperation with the ANR and the Fire Department, Respondent emptied and removed all underground storage tanks from the facility, removed contaminated soils from beneath and around the tanks, and disposed of those materials.

21. The Agency estimated that 2,600 gallons of product was released. But, this estimate was based entirely on inventory discrepancies, which may or may not be caused by a release. The Court therefore finds the estimate based on inventory records alone inconclusive.

22. In its "Site Investigation and Corrective Action Report," Respondent's environmental consultant noted that the amount of contaminant removed in the initial venting of the storm drain is unknown, but estimated that approximately 95.7 gallons of gasoline was removed in later venting. Ex. 28 at 12. The report also notes that contaminated liquids and solids were removed from the site in the initial response, but gives no estimate as to the amount of product removed at that time. Id. at 4. In addition, the report offers a high estimate of 1,592 gallons of gasoline removed from soils around the site. Id. at 18.

23. The site has been a gas station since the 1950's and some of the contaminated soil samples contained MTBE, a compound that was used in gasoline for a period of time prior to 2007. This suggests that some of the contamination occurred in the past. Determining what contamination is attributable to the release in 2011 and what was historic contamination complicates whether a significant release occurred.

24. It is also unclear when the 2011 release began.

25. ANR issued an administrative order (AO) dated May 3, 2016, alleging five violations related to the release.

26. ANR's cost of enforcement included approximately $9,466.35, attributable to the time spent by the Agency's environmental analysts, enforcement officer, and waste management and prevention representative.

27. Respondent has three prior violations of 10 V.S.A § 8003 or related rules, permits, orders or assurances of discontinuance in the prior seven years.

## Determining Violations and Penalty Assessment

When a respondent requests a hearing on an AO, we have the authority to determine whether the alleged violation occurred. 10 V.S.A. § 8012(b)(1). ANR carries the burden of proving the alleged violations by a preponderance of the evidence. Id. § 8013(a). If ANR meets this burden, we are required to "determine anew the amount of a penalty" that should be assessed against the respondent challenging the ANR order. Id. § 8012(b)(4). We therefore

4

review the evidence before the Court and determine an appropriate penalty assessment, pursuant to the eight subsections of 10 V.S.A. § 8010(b)(1)–(8).

ANR, and this Court in this proceeding, must consider seven factors when assessing a penalty:

(1) the degree of actual or potential impact on public health, safety, welfare, and the environment resulting from the violation;
(2) the presence of mitigating circumstances, including unreasonable delay by the Secretary in seeking enforcement;
(3) whether the respondent knew or had reason to know the violation existed;
(4) the respondent's record of compliance;
(5) [Repealed.]
(6) the deterrent effect of the penalty;
(7) the State's actual costs of enforcement; and
(8) the length of time the violation has existed.

10 V.S.A. § 8010(b)(1)–(8). The maximum penalty for each violation is $42,500, plus $17,000 for each day a penalty continues. Id. § 8010(c)(1). Generally, ANR treats multiple violations of the same permit, or related violations generally, as one violation when calculating penalties. We take the same approach in this case, and analyze the five violations as a single violation.

The State may also "recapture economic benefit" that the violator may have derived from the violation, up to the total maximum penalty allowed of $170,000. Id. § 8010(c)(2).

In an effort to standardize penalties and ensure a fair process, ANR enforcement officers use a form that is based on the seven factors. They rate the severity of the violations from 0 to 3 for factors (1), (3), (4) and (8), and come up with an initial penalty score. The highest possible initial score is a 15, which equates to an initial penalty of $42,500 for a Class I violation, the maximum allowed. Classes II, III, and IV carry lower maximum penalties of $30,000, $10,000 and $3,000 respectively. The initial penalty can then be adjusted based on penalty factors (2), (6) and (7). If the violator signs an Assurance of Discontinuance, agreeing not to dispute the action, the final penalty may be reduced by 25%.

Number of Violations

At the outset of the Court's penalty assessment, we recognize that the Administrative Order at issue in this matter alleges five violations: 1) the prohibited release of hazardous

materials into the surface, groundwater or land of the state – 10 V.S.A. § 6616; 2) failure to install appropriate overfill protection – VUST Rules § 8-406(b)(1)(C); 3) failure to install cathodic protection – VUST Rules § 8-405(a)(1)(B); 4) failure to make documents, records, and reports available – VUST Rules § 8-502(e); and 5) failure to report a suspected release – VUST Rules § 8-506(b)(2).

ANR, and therefore this Court on appeal, has discretion to calculate and assess one penalty for events that result in more than one violation or to calculate and assess a separate penalty for each violation stemming from the same activity. In the AO at issue, ANR considered the five alleged violations in three separate penalty assessments (one for the alleged release (10 V.S.A. § 6616), one for the alleged failure to report a release (VUST Rules § 8-506(b)(2)), and one for the remaining alleged violations). Because the alleged violations regard the Pearl Street Station only and relate to the same proximate time, we conduct a single penalty assessment. Additionally, we take this approach because the evidence does not clearly establish each separate violation having independent cause for environmental or human health concerns.

The parties do not dispute the core facts of the violations. Respondent offers that the release at issue was unknown, had a short duration, and a well-intended remedial response by Respondent. Thus, Respondent contests the amount of ANR fine.

<u>Class of Violation(s)</u>

We conclude that the release in this matter present a Class II violation. A Class II violation includes violations which present more than a minor violation of a statute listed in 10 V.S.A. §8003(a) or a rule promulgated under statute listed in 10 V.S.A. §8003(a). ANR suggested that the events presented a Class I violation as a threat of substantial harm to the public health, safety, or welfare or to the environment. As detailed below, the release of petroleum did not result in a threat of substantial harm and we therefore decline to classify the violations as Class I.

Calculation of Base Penalty:

*Penalty Factor 1: Actual or Potential Impact on Public Health, Safety, Welfare and the Environment*

Subsection (1) of 10 V.S.A. § 8010(b) requires consideration of "the degree of actual or potential impact on public health, safety, welfare and the environment resulting from the violation."

In considering ANR's penalty calculation form, we assign a value of "1" to the degree of impact on public health, safely, and welfare (ANR form Question 1) as we conclude there was evidence of minor actual impact or moderate potential impact from the release and response. The moderate potential impact on public health, safety and welfare stemmed from the risk of ignition or explosion as well as human exposure to gasoline product and fumes. The potential of these risks was moderate due to the volume of gasoline release and path that the product migrated over. The minor actual impact was the closing and evacuation of the Shopping Plaza.

We assign a value of "1" to the degree of impact on the environment (ANR form Question 2) as we conclude there was minor actual impact and moderate potential impact to the environment from the release. Petroleum was released from the facility, migrating via groundwater towards the Shopping Plaza property. The credible evidence supports a conclusion that the violation caused minor _actual_ impact that harmed the environment.

*Penalty Factor 3: Whether the Respondent Knew or Had Reason to Know the Violation Existed*

Subsection (3) of 10 V.S.A. § 8010(b) requires consideration of "whether the respondent knew or had reason to know the violation existed." The ANR penalty calculation form includes two parts related to this subsection: 3a, knowledge of the requirements, and 3b, knowledge of the facts of the violation.

Respondent knew or should have known about their legal requirements under the Waste Management statute and the facts of the violation. 10 V.S.A § 6616 is only two sentences long and clearly states that the release of hazardous material to surface or groundwater is prohibited. Thus, in considering ANR's penalty calculation form, we assign a value of "1" for Respondent's knowledge of requirements (ANR form Question 3a, which assigns a "1" where respondent "had reason to know about violated requirement").

7

As to Respondent's knowledge of the facts of the violations we assign a value of "1," concluding there is evidence that Respondent "could not have reasonably known that the violation existed" (ANR form Question 3b). There is not clear evidence that Respondent knew or should have known about the release before it was discovered. Respondent's technician had been dispatched to the site to investigate possible sources of inventory discrepancy. Respondent alleges that numerous state inspections, in addition to the Tanknology inspections, did not reveal a faulty O-ring or the other alleged violations. Because the cause of the release remains unknown today, we cannot conclude that Respondent should have been aware of the release sooner.

*Penalty Factor 4: Respondent's Record of Compliance*

Subsection (4) of 10 V.S.A. § 8010(b) requires consideration of "the respondent's record of compliance." The evidence presented shows that Respondent had three previous violations of ANR's regulations. In considering ANR's penalty calculation from, we assign a value of "3" for this subsection (ANR form Question 4).

*Penalty Factor 8: Length of Time the Violation Existed*

Subsection (8) of 10 V.S.A. § 8010(b) requires consideration of "the length of time the violation has existed." From the evidence, the Court is unable to determine when the release began. Respondent immediately began responsive action the day it was informed of petroleum vapors emanating from the storm drain and began working with the Agency to develop an appropriate response. After an inspection of the facility, the owners of the Shopping Plaza brought in a consultant and installed a ventilation system on the storm drain where the gasoline vapors had been detected. The ventilation system was effective at removing significant gasoline vapors from the storm drain system. Disputed evidence was offered at trial concerning the discovery of a faulty O-ring, and the details of Respondent notifying the Agency. Respondent complied with the Agency and pumped all underground storage tanks at the facility, emptied and ceased operation of gasoline and diesel dispensing activities, removed all underground storage tanks from the facility, removed free product and petroleum contaminated soils from beneath and around the tanks, and properly disposed of those materials.

Additionally, the results of the remediation call into question the scale of the release that occurred in 2011. Evidence from the remediation clearly indicate there were releases that

predated May 2011. The site has been a gas station since the 1950's and some of the soil samples contained MTBE, a compound that was used for a period of time prior to 2007. Determining what contamination is attributable to the release in 2011 and what was historic contamination complicates whether a significant release occurred.

In considering ANR's penalty calculation form, we assign a value of "1", concluding that this violation existed for a very short duration (ANR form Question 5).

In adding the above penalty scores we arrive at a base score of 7 which equates to a base penalty of $12,000 for a Class II violation.  See ANR form Question 6.

Penalty Adjustments:

We next consider appropriate adjustments to the base penalty.

*Penalty Factor 2: Mitigating Circumstances*

Subsection (2) of 10 V.S.A. § 8010(b) requires consideration of "the presence of mitigating circumstances, including unreasonable delay by the secretary in seeking enforcement."  The release occurred in 2011. ANR issued Respondent a NOAV on June 8, 2011 and an EO on June 16, 2011. ANR waited until May 2016—nearly five years—to initiate enforcement proceedings.  The consequences of the delay are notable. The State acknowledges that many of the documents related to this case have been destroyed. The Essex Junction Fire Department no longer has its notes from the incident. The substantial delay in prosecution has significantly disadvantaged both parties, particularly Respondent's ability to present an adequate defense.

Furthermore, Respondent responded promptly and attempted to bring the subject property into compliance voluntarily including by emptying and removing all underground storage tanks from the facility, removed contaminated soils from beneath and around the tanks, and properly disposed of those materials.   This evidence weighs heavily against the timeliness of ANR's actions.

Based on these facts, the Court reduces Respondent's penalty based on mitigating circumstances in the amount of $3,000.

*Penalty Factor 6: The Deterrent Effect*

Subsection (6) of 10 V.S.A. § 8010(b) requires consideration of "the deterrent effect of the penalty."  The Secretary may increase the penalty amount up to the maximum allowed in the

9

class of violation if the Secretary determines that a larger penalty is reasonably necessary to deter the respondent and the regulated community from committing future violations. Id. In this matter the maximum penalty is $30,000 and the base penalty we have calculated is $12,000, allowing for a maximum deterrent of $18,000.

In reviewing the importance of establishing a penalty that will have a deterrent effect upon Respondent, we consider that Respondent was cooperative with ANR throughout the investigation and remediation of the release. Furthermore, we conclude that the short period of time that the violations existed once Respondent was on notice, and Respondent's prompt and complete remediation of the release does not warrant a deterrent portion to be added to the initial base penalty.

*Penalty Factor 7: State's Actual Costs of Enforcement*

Subsection (7) of 10 V.S.A. § 8010(b) requires that we consider "the state's actual cost of enforcement." The value of the time that all ANR personnel committed to responding to Respondent's violations, totals $9,466.35. We direct Respondent to reimburse these costs as an additional penalty for the violations.

*Economic Benefit*

The Secretary may recapture any economic benefit Respondent may have gained by violating its permit. 10 V.S.A. § 8010(c).

While we believe that recapturing economic gain from a violation is appropriate, we conclude that based on the evidence before the Court, it appears that Respondent did not realize a gain or economic benefit from the violations. Thus, we decline to impose any amount of additional penalty relating to economic gain.

*Reduction for Settlement*

Finally, ANR may reduce a respondent's penalty when the respondent admits the violation and enters an Assurance of Discontinuance fully resolving the compliance issue. Such a reduction is not warranted in this matter as Respondent did not resolve their dispute by settlement.

The Court therefore decreases the base penalty of $12,000 by subtracting mitigation for ANR's delay in initiating enforcement and Respondent's prompt investigation and remediation in

the amount of $3,000 and adds $9,466.35 as reimbursement of ANR's costs of enforcement.  The total penalty in this case is $18,466.35.

## Conclusion

For the reasons stated above, we conclude that for the five violations at issue within the May 3, 2016 AO, Respondent shall be liable for a total penalty in these proceedings of **$18,466.35**.

## Rights of Appeal (10 V.S.A. § 8012(c)(4)–(c)(5))

This Decision and the accompanying Judgment Order will become final if no appeal is requested within 10 days of the date this Decision is received.  All parties to this proceeding have a right to appeal this Decision and Judgment Order.  The procedures for requesting an appeal are found in the Vermont Rules of Appellate Procedure (V.R.A.P.) subject to superseding provisions in Vermont Rule for Environmental Court Proceedings (V.R.E.C.P.) 4(d)(6).  Within 10 days of the receipt of this Order, any party seeking to file an appeal must file the notice of appeal with the Clerk of the Environmental Division of the Vermont Superior Court, together with the applicable filing fee.  Questions may be addressed to the Clerk of the Vermont Supreme Court, 111 State Street, Montpelier, VT 05609-0801, (802) 828-3276.  An appeal to the Supreme Court operates as a stay of payment of a penalty, but does not stay any other aspect of an order issued by this Court.  10 V.S.A. § 8013(d).  A party may petition the Supreme Court for a stay under the provisions of the Vermont Rules of Civil Procedure (V.R.C.P.) 62 and V.R.A.P. 8.

Electronically signed on November 13, 2017 at 11:05 AM pursuant to V.R.E.F. 7(d).

_____
Thomas G. Walsh, Judge
Superior Court, Environmental Division

11